## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEBORAH WALTON, | ) | Case No.1:15-cv-0822 TWP-DML |
| Plaintiff, | ) | |
| v. | ) | Judge Tanya Walton Pratt |
| | ) | |
| EOS CCA and AT&T, and EXPERIAN, | ) | Magistrate Judge Debra McVicker Lynch |
| Defendants. | ) | |
| | ) | *FILED* |
| | ) | JUL 26 2017 |
| | ) | U.S. CLERK'S OFFICE |
| | ) | INDIANAPOLIS, INDIANA |

### MOTION OBJECTINT TO MAGISTRATE DEBRA McVICKER  LYNCH REPORT AND RECOMMENDATION ON PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT IN IT'S ENTIRETY

Come now, Plaintiff Deborah Walton, pro se, pursuant to Federal Rules Civil Procedures 56 respectfully request Objects to Magistrate Debra McVicker Lynch's Report and Recommendation to Deny the Plaintiff's Cross Motion For Summary Judgment and Grant the Defendants Motion for Summary Judgment in it's entirety for the following reasons:

The Plaintiff only has to prove two key points to survive a Motion For Summary Judgment and Prevail in a Cross Motion For Summary Judgment, in this case:

   a.  Is there an issue of material facts in dispute.

   b.  Did the Defendant violate the FDCPA and FDRA.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "Fed .R. Civ. Proc. 56( c).  The moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S.

317 (1986); *Cedillo v. Int'l Assoc. of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10 (7th Cir, 1979). Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial. "Fed. R. Civ. P. 56( e). A "genuine issue" in the context of a motion for summary judgment is not simply a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). The substantive law of the issues raised by the claims asserted in the complaint determines what is "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 478 U.S. 242, 248 (1986). By these standards, Plaintiff's motion for summary judgment should be granted.

## THE PLAINTIFF HAS MATERIAL FACTS IN DISPUTE

1. The Plaintiff is disputing issues of material fact, (1) She did not own AT&T for the Debt EOS CCA was trying to collect for AT&T. (2) She did dispute the debt that EOS CCA was attempting to collect for AT&T, verbally and in writing. (3) EOS CCA did not validate nor verify the Debt with AT&T, and (4) EOS CCA did not comply with the FDCPA nor the FCRA according to the statues. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The Plaintiff did support her assertions with Affidavits and the admissions in the deposition of Mr. McCrevan's testimony, whom is a current EOS CCA employee.

## EOS CCA VIOLATED THE FDCPA

2.    According to the EOS CCA Mr. McCrevan, by his own admission *See Exhibit "A"* (Depo McCrevan pgs 72-78), EOS CCA did not validate the Debt they were attempting to collect from the Plaintiff in accordance with the Fair Debt Collection Practice Act, (FDCPA), not only did then not validate the debt, they also boosted about why they never validate debt with AT&T.

## EOS CCA VIOLATION OF THE FCRA WAS WILLFUL MISCONDUCT

3.    According to section 1681s-2(b)1 of the FCRA requires furnishers to properly investigate a consumer's dispute filed with the Credit Reporting Agencies about the accuracy of information provided by the furnisher to the Credit Reporting Agencies.  The Fair Credit Reporting Act allows a private right of action against a furnisher for violating its investigation duties under section 1681s-2(b)(1).  There are two requirements necessary for a claim to succeed. 1) The Plaintiff must establish that the furnisher acted unreasonably in its investigation of disputed information that it failed to correct incomplete or inaccurate factual information; and 2) That a reasonable investigation would have uncovered inaccurate information.  Companies that act as Furnishers to the Credit Reporting Agencies must have adequate policies and procedures in place to ensure that they are complying with these requirements, including procedures to periodically test systems to verify compliance.

4.    Magistrate Judge correctly notes the standard of review in summary judgment, including that the "court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences from the evidence in favor of the nonmoving party. (Dkt. 110, p. 5, citing to Zerante v. DeLuca, 555 F.3d 582, 584 (7th Cir. 2009).  However, the Federal Court Recommendation then appears to contradict this

standard. In regard to the testimony of Andrew McCrevan, an EOS employee, the Recommendation states that Mr. McCrevan "did not believe he had a reason to question the accuracy of the data that EOS had received from AT & T." (citing to McCrevan Dep., p. 75, line 25 to p. 76, line 4, and at p. 77, lines 6-11.) (Dkt. 110, p. 22.) This is an inaccurate summary of the deposition testimony:

**"Q:** I'm putting it all together and asking what I think is a pretty reasonable question. You are processing this ACDV. The ACDV says that is not mine. This does not belong to me, this account. You have at that moment records of calls that she has made starting almost immediately after that first letter went to her in which she says that this is not my account and I don't owe any money. Did any of that, any of these notes telling you that she has been making - - she has made three calls and is now disputing this through Experian - -did any of that tell you or cause you to question, I should say, the accuracy of the data that you're getting from AT & T? ...

**A:** Like I said, we verify the information that we are provided with.

**Q:** Don't you ever question whether or not that information that you're getting from your - - from the original creditor is accurate itself? ...Well, when your process - - when you used to process ACDVs, did you at any point have any reason to question the accuracy of the data you're getting from the original creditor?

**A:** No.

**Q:** And you don't think that, in this case, where you have a consumer who's called three times and made a dispute through Experian, all of which are claiming that she does not owe any money and that this is not her account, none of that caused you to think that there might be something wrong with AT & T's data?

**A:** If she had given us a specific reason why.

4

**Q:** What could she give you, other than saying it's not my account?

**A:** Maybe, she could provide us with a reason that it isn't accurate.

**Q:** It's not reason enough to just say that it's not mine?

**A:** Well, then, that would be the reason why we would verify the information to see if everything does match.

**Q:** Sure. But you've - - you've told me everything that you've done, and at no point, I think - - and correct me if I'm wrong - - did you question the link between the AT & T - - account information and Ms. Walton, right?

**A:** No. ..

**Q:** You never questioned, in other words, AT&T's data - -

**A.:** No.

**Q:** - - right? No you didn't, or no, I'm wrong?

**A:** No, I didn't.

**Q:** Okay. And you never contacted AT&T, correct?

**A:** Correct.

**Q:** Could you have?

**A:** I am not sure.

**Q:** Well, are you - - are you allowed to contact the original creditor in responding to an ACDV dispute? ...

**A:** I don't think so.

**Q:** You don't think you are allowed to contact the original creditor? Is that part of the policy there?

**A:** I don't think I was allowed to personally.

**Q:** Well, what do you mean by that?

**A:** Like, I couldn't contact AT&T for every ACDV I received.

**Q:** Why not?

**A:** I'm not sure."

(Dep. Andrew McCrevan, p. 74, line 10-p. 78, line 10, objections omitted.)

In other words the witness never questioned the accuracy of the information as a matter of policy. The implication of the Recommendation is that, specific to this case, the witness had no reason to question the data. This is in conflict with the standard of review and erroneous… …, *See Exhibit "A"* (Depo McCrevan pg 72-78), they did not comply with the Fair Credit Reporting Act, (FCRA), when they made the following statement. This statement also shows EOS CCA was acting with willful misconduct.

**MAGISTRATE DEBRA McVICKER LYNCH MISINTERRUPTED EOS CCA DEPOSTION**

5.   The Plaintiff made her initial call to EOS CCA on or about February 5th disputing the AT&T account, followed by two letters to EOS CCA prior to EOS CCA furnishing the negative reporting to the Credit Reporting Agencies, however; on April 6th 2015, EOS CCA responded to an ACDV from Experian. *See Exhibit "A"* (Depo McCrevan pg 72-78), and their response was the information they furnished was correct.

6.   Magistrate Debra McVicker Lynch, got it wrong when she referenced EOS CCA The Deposition of Mr. McCrevan pg. 86-87, she referenced, did not go far enough, if she would have read on to the next few pages, she would have seen Mr. McCrevan was responding yes to the question, 'Did EOS CCA delete the account from Experian on May 29th', which was actually three days after the Plaintiff filed her complaint on May 26th *(emphasis added)*.

"**Q:** Do you know whether or not EOS received any other ACDVs ?

**A:** It seems on – it seem, like, on 5/29—there were two of them received on 5/29.

**Q:** Okay. And are you on Page 11 of the notes ?

**A:** Yes.

**Q:** And where n particular are you looking at, which note ?

**A:** It was at 12:18 p.m.  "Received ACDV, Tu"

**Q:** Just give me a second.  Okay. Got it. And where is the second one ?

**A.:** On 5/29, 12:19, "Received ACDV, Experian."

**Q:** Alright. Can you tell from these notes how these ACDVs were investigated ?

**A:** It looks like they were deleted.

**Q:** In other words, the response was to delete ?

**A:** Yes.

**Q:** Okay. Whereas your response was you selected response code No. 1 when you processed your ACDV, right, which was to verify, correct ?

**A:** Yes.

**Q:** Do you know – can you tell from the notes – and I know that you didn't process these ACDVs, right ?

**A**: No, I did not.

**Q:** Okay. Were you involved in any way in processing these ACDVs ?

**A:** No.

**Q:** And is that because you had left that department ?

**A:** Yes.

**Q:** Can you tell from the notes, though, what was done to investigate those disputes ?

**A:** It looks like they were deleted.

**Q:** Can you tell from the notes why ?

**A:** Well, it seems that right above the account was closed.

**Q:** So are you saying that would be the reason why they would respond with delete ?  Is that how you're reading this ?

**A:** Well, it looks like the dispute code on one is – is slightly different than the one I received

as well, and the FCRA relevant information is different as well.

Q: Okay. And so tell me if you disagree with this synopsis of what happened here.  On May

27th EOS received the complaint – a complaint filed by  Ms. Walton, correct  ?

A.: Yes.

Q: Two days later on May 29th, the account was closed ?

A: Yes.

Q: Alright. And then, on that same day, the account was closed and an ACDV was received

from TransUnion and an ACDV was received from Experian, and the response to those

ACDVs from those consumer credit reporting agencies was to delete the account ?

A: Yes.

Q: And were there any calls that we haven't talked about that were made or received from

Ms. Watson – Ms. Walton ?

I'm sorry. I apologize.  I have two clients, and they both have very similar

names, and I keep doing that.

Were there any calls that were received that we haven't discussed prior to the

receipt of the complaint by EOS on May 27th ?

A: Do you mean prior to May 27th ?.

Q: Yeah. Right. So we talked about the calls that – that were received and that are in these

notes prior to when you processed your ACDV's now talking about the time in between

the closing of the account and when you processed your ACDV.  So April 6th forward to

May 27th,  are there any calls reflected in these notes ?

A: No.

Therefore, it's very apparent from the deposition of Mr. McCrevans, that EOS CCA did not

delete the AT&T account from the Plaintiff's credit report with Experian until after she filed a

Federal Complaint.  See Exhibit "B" (Depo McCrevan pg 86-89).  Please note that the

Plaintiff contacted EOS CCA in February and made numerous calls and sent two letters

before EOS CCA ever furnished the negative reporting to the Credit Reporting Agencies.

6.      Judicial admissions are formal admissions in the pleadings, or stipulations by a

party or its counsel, that are binding upon the party making them.  They may not

be controverted at trial or on appeal.  Indeed, they are "not evidence at all but

rather have the effect of withdrawing a fact from contention."  Michael H.

Graham, Federal Practice and Procedure:  Evidence sec. 6726 (Interim Edition);

see also John William Strong, McCormick on Evidence, sec. 254, at 142 (1992).

A judicial admission is conclusive, unless the court allows it to be withdrawn;

ordinary evidentiary admissions, in contrast, may be controverted or explained by

the party. Id. Keller v U.S., 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995).  Even if, in

this instance, the witness's admission in his deposition is treated as an evidentiary

admission---that EOS CCA did not follow up to check the accuracy of the information

from the creditor after the Plaintiff disputed the debt and that the witness was

uncertain if he even could follow up with the creditor to ascertain if the

information was accurate---EOS CCA did not attempt to controvert or explain this

testimony.  Therefore it stands as an admission.

7.      If EOS CCA had processed the ACDV's correctly, and verified the debt with AT&T,

they would have discovered, that the account number they were given by AT&T was

incorrect, and, they would of found out that AT&T had also received payment for the

Plaintiff's U-Verse account three times, and sent the Plaintiff a refund check for the

difference in the deposit she placed with AT&T at the time of the installation.  EOS CCA's

lack of Policy and Procedures required under the FRCA, is not only, reckless disregard of

the statue, it is also an act of willful misconduct.

Wherefore, Plaintiff Deborah Walton, pro se, respectfully requests this Court reject the Report and Recommendation to Deny the Plaintiff's Cross Motion For Summary Judgment and Grant the Defendants Motion for Summary Judgment in it's entirety, and for reasons set above and for the cost of this action, for actual damages, for reasonable attorney fees and for all other just and  proper relief.

Respectfully submitted,

Deborah Walton, pro se

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been deposited in the U.S. mail, first-class postage prepaid, on the 26th day of July 2017, addressed to:


David M. Schultz
John P. Ryan
Hinshaw & Culbertson, LLP
222 N. LaSalle,
Suite 300
Chicago, IL 60601


Deborah Walton